I'm here on behalf of the appellant Natalie Swanson. Her husband, he passed away during dependency of this appeal, so he's no longer a part of it. I couldn't hear your words. I'm sorry. I'll speak up. I'm just here on behalf of the appellant. And I want to get right straight to the issue of whether or not there is a valid property right or property interest in the use of the structures that are the subject of this case. Can you address whether or not that claim remains after the previous litigation? The right to use claim? Sure. As I understand it, the previous case that was dismissed, you asserted first that the act, I think I'll call it the S.R. Act, didn't apply. But you could have asserted at that time, could you not, that you had a property right to use the property. And if you didn't, and that case was dismissed, don't we have claim preclusion? That would be true. However, that was in the first case. However, those claims were dismissed, that the issue on whether there was a right to use the property on the declaratory relief was dismissed as a as moot. As moot. Well, I had failed to exhaust administrative remedies at that time. And if they were dismissed with prejudice, they were dismissed with prejudice. The judge's order from 2006 dismisses those claims with prejudice. And if they were dismissed with prejudice in 2006, how can you reassert them now? Well, my understanding of the order was that the part that was dismissed for failure to exhaust administrative remedies, that went directly to the right to use the structures. And it was deemed moot because by that time, the structures had been demolished. But then the case, the second case, which was filed after that when all the administrative remedies had been exhausted, it still claimed that they had had a property interest in the use of it, and the claim was then that there should have been some consideration taken when they lost that right to use them if they are not incident to mining. They had permission from the United States Forest Service, which is something that was never really addressed by the district court. There's a letter, November 16, 1977, that's pled in the paragraphs 27 through 29 of the complaint, where they got a letter that very specifically gave them detail of what they had permission to use. Lifetime permission? There wasn't a time set on it, so I would consider it a life estate permission. So it's like a deed, like they get treated as a deed to the property? I would treat it as a life estate for the use of the site. Counsel, I was kind of puzzled. I had a case where I had to figure out a lot about mining claims called Shumway. Nobody cited it. It seemed to lay out what Ninth Circuit law is on mining claims. Is it bad for your case? Is that why you didn't cite it? I'm sorry. I'm not familiar with that case. It explains that a mining claim is not a claim in the lay use of the word. It's property right. And it exists forever, like a property right, so long as the property is used for mining. And if you want to do something else with the property, like you want to subdivide it and build a suburb there, what you do is you get a patent for it. But as long as you're using it as a mining claim, it's your property, along with whatever is incident to the mining activity. I don't think that was raised in the – that argument was raised in the case that was previously dismissed, was it? No, I wasn't aware of that case. And if that does not bar this claim, then it would seem to me that there would still be a right to use these buildings, these stone buildings, for purposes incident to mining or to be compensated for them, inverse condemnation, if the government destroyed them. However, I did not see where in the complaint it alleged what uses incident to mining the stone structures played. It was obvious they could have been used incidental to mining operations, but I couldn't see where there was a pleading that they were. What does it say? There is – well, in paragraph 35 of the complaint – Okay, read the words. Let me see if it was 35. Which is on AP6. It says that the – let's see. The plaintiffs relied on the statements by the United States Forest Service contained in the letter dated November 16, 1907, and expended time, labor, and funds to maintain and improve the mill site, including the structures. And it talks to that and says plaintiffs brought personal property to the mill site for use in their mining operation. More specifically – How? Personal property for use in their mining operation. Right. And then – How? I'm getting to – I'm sorry. How? Maintained the structures for use in their mining operation. What mining operation? How was it used? Does it plead that? They went up and – well, in paragraph – I mean, what it looked like was it was implausible under Twombly and Iqbal that it was used in the mining operation because they're only up there a couple weeks out of the year. Well, they would go up there and search for – get samples of rock and put them through the washers. And then if you look in paragraph 76 of the complaint, which is on AP9 and 10 – Where does it say – I can't remember. Are they – have they been doing that every summer, does it plead? Or just that they did years ago? Well, as of 2006, in paragraph 76 of the complaint, there was a geologist that had done a report that confirmed that as of – actually, 6-1604, they were still using it. It had an active permit and were mining quartz. Did the Forest Service determine that these structures were not incident to mining? They did, but they had – Now, did that get appealed, administratively appealed? Yes, they did. And what was the result of that? They lost that appeal. Okay, but why isn't that the end of that issue? Well, because then it came – that's when they were in pro per. I don't know the specifics of that, but – Well, that's not a defense that they were in pro per. I mean, if they – if the Forest Service says, we're going to start a procedure to declare these things not incident to mining. Right. They lose that. They appeal that. They lose that. I'm not clear why that doesn't resolve that issue, that these structures are not incident to mining. Well, then they went to federal court to seek a determination that the Surface Resources Act didn't apply to them. And they lost their – is that right? Finish, please. Yeah. They lost their, right? Yes. What was – is that the end of that? Well, even without the surface – That was in the previous case. That was in the previous case. And they lost that. They lost that there. Okay, so why are we here again? Because even as the respondent said in their brief, if there was permission to use it, and they said there was never any permission or authorization to use it, which isn't the case here, even without the Surface Resources Act, they had permission from the U.S. Forest Service in November. I don't think permission matters. I mean, you may have permission to put up your tent and camp in a national park. It doesn't give you any property right. A mining claim does give you a property right, and not just to the minerals, but to the building's incident to mining, the place where you store your scales, the place where you store your ore, the place where you store your D8 cat that you use for digging out stuff and your suction dredges and all that. But if the Forest Service says you're not using it for that, and you say you do, and you go through the appellate procedure, and it's determined at every level of the appellate procedure, nope, you're not using it for mining, a long time since the property's been used for mining, and you get a final adjudication in court, why isn't it over? Well, in this case, there was information that my clients didn't get until they went under the Freedom of Information Act. They went to the San Diego office to ask for the file on the property. Somebody went back to get it, and then they were told they couldn't have it, but they saw a note on that file that said we may be sued. They didn't get the file. They got it under the Freedom of Information Act later. They went through it, and in there, they discovered some things like that had not been. There was a note. Let's stipulate they were jerked around by the Forest Service because it's trying to run the miners out. Okay. Let's just stipulate to them. Still, why didn't it succeed? Because they didn't appeal the determination that they weren't mining. Why didn't they succeed? Didn't they succeed in the administrative appeal? No. Why don't they lose in this case because they did not succeed in – because the Forest Service did succeed in obtaining a final judicial determination that they were not, in fact, using the property or the outbuildings for mining? Well, I think the Forest Service concealed information that they got from the Freedom of Information Act. So a judgment that's based on falsehood that isn't challenged in the procedure for challenging a judgment based on falsehood and concealment is still a judgment. It's my understanding, and I could be incorrect, but my recollection is that they got the information from the Freedom of Information Act after the inspection. But I'm having trouble understanding what information they could have gotten from the Forest Service that told them that the Forest Service had told them that they had permission. I mean, your argument is that they had been given permission to use these properties by the Forest Service. Oh, and they were. So wouldn't they know that or not know that? Well, I don't think they did know it. They didn't know they'd been given permission? The Swansons knew it, of course, because they got the letter November 1977. I don't believe the Forest Service in 2003 or 2004, when they came to do the inspection, I don't believe they knew that they had given permission. And under the Freedom of Information Act, when they went and looked at that file, there's a note in there that said, look for anywhere that we've given permission. We don't want any skeletons in the closet. Why wouldn't they have to challenge the 2006 judgment under Rule 60B for fraud? They could have done it that way, I think. Well, why wouldn't that be the only way that they could avoid being collaterally stopped or having it established by race judicata that they're out of luck in this litigation? I'm trying to see. Well, let me direct your attention to this. I was just trying to get my date in my mind of when they got this information from the Freedom of Information Act, and I'm not ‑‑ I have to just refresh my recollection on that because I don't ‑‑ Well, maybe you can do it while you take a couple minutes for rebuttal. And when you come back up, I'd still like you to address. I'm looking at page 9 and 10 of the 2006 judgment. And it says, Plaintiff's request for declaratory relief regarding their property right in the use of the stone structure is also laximary. And then the judge explains why, right or wrong. And then he says, Accordingly, the court grants defendants motion to dismiss plaintiff's request for declaratory relief with prejudice. So it seems to me if you're asserting today that you have some right to use the property, that was adjudicated in 2006. So, and again, maybe you want to take a minute to sit down and think about this, but that's, to me, that's, I can't get past that part of the judgment that dismisses your claim for use of the property with prejudice. It may well be, as Judge Kleinfeld says, that you had a good claim or a bad claim. I don't know. I don't know what the facts are. But you went to court, and one of the things you said in 2006, your client said, is we have the right to use this property. And the judge says, I'm dismissing that claim with prejudice because it lacks merit. The judge's reasoning may have been entirely wrong. But don't you have to appeal that before you file a new suit that essentially says we have the right to use the property? Well, in my recollection, and I'll look at this as well to address it on rebuttal, is that in that order, it was dismissed as moot. Well, that's right. The judge may have been wrong. Which wasn't final. The judge may have been wrong. But it's a final judgment. He dismisses the claim with prejudice. Don't come back. Don't tell him, don't, don't. So that's – and think about that issue, because I have great difficulty thinking that any claim for use of the structure survived that judgment. Why don't you take the time for rebuttal and you think about the answer to that one. Thank you. Good morning. Good morning. If it please the Court, Assistant U.S. Attorney Steve Hsu on behalf of the United States. I'm curious. Did you read Chemway? I did, Your Honor. Ah, good. So you know that a mining claim is actually a property right and that it's not merely – they're not just guests in the government's house. Correct, Your Honor. Under Chemway, of course. Now, precisely what finding do you have? I saw where the judge in 2006 said that the Swansons say that although they don't conduct any mining, they did claim to bring a sluice box out of the mill site to wash rocks during one month each year. There the judge appears to be describing what the plaintiffs said. Did the judge make a finding that they don't do any mining? The way the judge handled that issue, Your Honor, was by raising it precisely as you had done, which is an examination of plaintiff's complaint to determine at the 12B stage has plaintiff correctly or successfully alleged what is necessary, what's required. And in this case, they would need to allege that they were using the structures for uses related to a reasonable incident to mining. As Your Honor correctly pointed out, they did not do so. And I can point to the language in the most recent complaint, the First Amendment complaint. Where did he do that? Sure. This is the index page 145, paragraph 19. The allegation by plaintiffs is plaintiffs have been conducting mining operations on the subject property continuously since 1974. That, however, is as far as they go in terms of describing what they actually do. They don't say what they use the structures for. They don't say precisely, for example, that we were doing X and had to use the structures to do X. It certainly would be easy to plead that, that that's where they keep their sluice box. Certainly. Keep it out of the rain and snow. But they didn't say that, huh? Correct. And that's, this is also precisely one of the reasons why in 2003 a mineral examiner was sent to do a field investigation on the mining claim, the land covered by the mining claim, and was accompanied by the plaintiff's late husband as well as their son, spent half a day on the site to determine if in fact, well, to determine what sort of mining activities they were engaging in and if the structures were reasonably incident thereto. And can you describe the administrative proceedings that ensued? Yes, Your Honor. What happened was in 2003 we had this field investigation by the mineral examiner, which led to a report and a determination in that report that the, there were no mining activities being conducted to the level which would require the use of structures. Okay. And then the report gets issued. What happens? The report then becomes the basis for a decision in May 5th of 2004 by the district arranger. That decision says, based upon our field investigation, the structures are not reasonably incident to mining, therefore, they should be removed. So addressing a point raised by. Before you address that point, are there any further administrative proceedings? Yes, Your Honor. So after, it is essentially a three-step process if one wishes to challenge or if, when the Forest Service is undertaking some sort of action. There is the initial agency action, which is done by the district arranger. That's what we just discussed in May of 2004. Thereafter, if the plaintiff is unhappy with that decision, they may appeal that to the next level to the forest supervisor. That was done here. A decision was issued in September 2 of 2004, which affirmed the decision of the district arranger. If the plaintiff is unhappy once again at that stage, they have one final recourse. Within 15 days, they can seek appeal to the regional forester. Plaintiffs actually failed to do that within the 15 days. What we have in the record is nearly two years later in 2006, some papers were submitted to the regional forester. The regional forester issued a one-page correspondence saying that we have received some materials for you. Even if we construe this as an appeal, your time ran long ago because you had to do so within 15 days, which would have put you back in 2004. And was that all done before the 2006 complaint was filed? I believe so, Your Honor, because, actually, I was a little unsure. So I don't know if you mean whether perhaps your opponent was reading from part of the complaint that I overlooked, but did you understand the 2006 complaint to raise a claim that the structures were being used incident to money? Well, the complaint doesn't allege that. However, when the issue was upon a motion to dismiss, plaintiffs did raise that issue, and then it was fully briefed at that time. The complaint, as I mentioned earlier, failed to make the allegations that the structures were used. So let me switch courses for you for a second. As I understand the claim that your opponent is making this morning, I don't think it said that the structures were being used incident to mining, but rather that there was some permission, verbal, I take it, that they could use the structures even if not incident to mining. Has that claim ever been litigated or exhausted administratively? It has been litigated, Your Honor, and that was disposed of by the district court in the most recent decision. The way it was addressed by the district court was that even if one were to assume that this 1977 so-called permission or this correspondence and whatnot gave them some sort of permission to conduct activities on, mining activities on the land covered by the claim and not to file a plan of operations, and that's the key that plaintiff has focused on, that they were allowed to not file a plan of operations pursuant to some correspondence in 1977. However, even if one were to look at that in the light most favorable to the other side, the district court correctly addressed this by concluding that as of 2004, the Forest Service made it very clear that you do now need to file a plan of operations because you have not been conducting mining operations to any level that would require you to use these structures. Therefore, we are going to remove this, or the structures should be removed. They're not reasonably incident to mining, and you now need to file a plan of operations regardless of what perhaps permission you may have had once before. So as the district court held, even to the extent that they had some permission, if you will, as of 1977, that was certainly revoked as of 2004. Is the personal property claim, the FTCA personal property claim, appropriately before us? Was it exhausted and therefore in front of us under merits? Our position, and we briefed this, is that it was not properly exhausted, Your Honor. Pursuant to the SF-95 administrative claim forms, plaintiff talks extensively about structures but not about any personal property, personal property in terms of things that could be stored within the structures, for example. The district court reviewed the administrative claim. That was briefed. We looked at all the language, including handwriting, that was put on the administrative claim forms. There was no reference whatsoever to personal property. Therefore, the agency was not even on minimal notice that it should investigate this issue. And I think the record indicates that when the final get-out-of-Dodge letter was sent, the Swansons were told they should remove their property. Did the judge make any findings with respect to that? You're talking about the TRO stage? Yes. What was done at that time, Your Honor, and this belapsed? In other words, does that impact the personal property claim at all, or is that just the district judge didn't rely on it? No, it does not impact the personal property claim. What happened at that time was, as Your Honor is aware, TROs are often done very quickly. No, but I do think the record in a TRO proceeding indicates that the Swansons were told, we are going to come and knock down these things, get all your personal property out of it. I just want to figure out whether I can't find a district judge relying on that and saying, no, your personal property claim fails for that reason. That's correct. There was some examination of the TRO order. The TRO order, of course, said you have until midnight of this day, so we're giving you some time to go in and get your things. And that, in fact, was done. The Forest Service was there to make sure that they were able to enter their property. But apparently not everything, according to their claim. Apparently, right, as alleged in the complaint, the plaintiffs were allowed to go into the structures, rather, and remove some property, whatever they chose to do, and they did do so. The district court did not rely on that part of the TRO ruling. There was some examination about the preclusive effect of a TRO proceeding and whether or not issues are actually litigated to their merits. And so the TRO order is important to demonstrate that the government has given the plaintiffs every opportunity, really, to litigate and present their case, even going so far as to give them extra notice and to allow them to apply for a TRO before any action was taken on their structures. And then the district judge found that they did not have a likelihood of success on the merits, and therefore denied the TRO. So I have one more question for you on the 2006 order. The language that I was referring your opponent to on pages 9 and 10, which dismisses with prejudice a declaratory relief claim for property rights and use of the stone structures. I know Judge Gonzalez didn't think this was preclusive, but do you think it's preclusive? I'm sorry. Page 9 and 10. It's – I have pages 74 and 75 in the appendix. The order in 2006 gets plaintiffs' request for a declaratory relief regarding their property right and use of the stone structures also lacks merit. And the judge says they've already been knocked down. And then – but the judge goes on to say the court grants defendants' motion to dismiss the request for declaratory relief with prejudice. Is that claim preclusive? Or I think Judge Gonzalez didn't rely on that. I'm trying to find out what the government's position is. Well, the issue was ultimately disposed of because it was moot at that time. You know, there was some claim preclusion discussion. You know, certainly there are a number of ways to approach it. You know, it could be precluded – could be subject to claim preclusion, but even if – Well, I know there's a number of ways to approach it. I'm trying to find out what the position of the United States is. What's your position? Does this preclude the claims that she's making? On declaratory – It is time that I had a property interest in these structures, and therefore I should be recompensed for the loss of that property interest. Do you think this finding precludes that or not? I think so, Your Honor. They have had an opportunity to present it, litigate it, and it has been decided on merits. Counsel, help me a little bit on my focus here. What was obviously moot was whether the Forest Service was entitled to knock down the structures because it already had. Is the Forest Service claiming that the mining claim itself is void or no longer valid, or just that the structures – the decision to knock down the structures is final and bars further litigation about the structures? As to the mining claim, I know the position of the government is not that the mining claim is now invalid and you have lost any – So they still have their mining claim. Precisely, Your Honor. And if they want to go out there and mine for courts or sell the claim to somebody who does want to mine for courts there, that's okay. They still have that claim. The government does not contest that they have that claim. Absolutely, Your Honor. It's their mining claim, their property. Correct. In fact, the removal of these structures has not affected their mining claim. And they would need a plan of operations if it was a big enough operation so it was not inconsistent with the Forest Service's use of the surface rights, and that's about it, right? Precisely right, Your Honor. In fact, this was addressed very much in depth in the 2003 field investigation, which was if we remove the structures, another way to approach it, if we remove the structures, is that going to impair your ability to mine under the mining claim? And the answer was no. So it's undisputed that Swanson still owns the mining claim, can still sell the mining claim, and this litigation does not address that. That's correct, Your Honor. Our position is that they have what they have always had, which is a possessor interest in the mining claim. But what it sounded like, frankly, from the record was they tried a little mining there, got a little bit of valuable mineral, they got old, the husband died, and may be going out there still a couple of weeks out of the year more or less recreationally. But that's true of thousands of mining claims in the United States, and then often they sell them to somebody who mines them. A lot of Alaska mining claims lay fallow for decades, and now they're getting millions of dollars worth of gold out of them because somebody came in with the capital to extract it. And this could be the same thing as far as the government's concerned. Is that right? It certainly could be, Your Honor. The mineral examiner who looked at this in 2003 concluded that there had been no large-scale mining operations for many years, and, in fact, that all that was being done … Small-scale will do, too. Correct. All that was being done was more recreational use, as was alluded to by opposing counsel. Sometimes people go out there for fun to reenact the gold rush, for example, pan some rocks and look around. Those reenactments, I know somebody who bought a house for $300,000 cash out of that kind of reenactment. Those mayonnaise jars full of gold. Right, right. So that, you know, the evidence … That was in the 70s, $300,000. Oh, really? We're not aware of any finding for that? We know that's not correct. My point is just to make clear what the focus is. It's solely on the structures. Correct, Your Honor. That's really been the target of the litigation all along. The plaintiffs have … Was there any evidence of what was in them? What I would expect is some mining equipment and some mayonnaise jars, if it was valuable minerals or other kind of mineral storage for less valuable minerals, and some business records relating to the mining. And I didn't see anything more specific than just that it was personal property. Nothing specifically in the record indicated the contents of the cabin. I can represent to Your Honors, however, that when the Forest Service did go in to take down the cabin, and beforehand when they also went in with the Swansons to ensure, pursuant to the district court's order, that they did have an opportunity to remove personal property, they looked inside and they found, for example, that there were tables, chairs, that they could eat inside, more living sort of items for occupation rather than for mining. That can be incident. It can be. You don't want to drive two, three hours and hike to get to your mining site every morning and go to work. It can be in certain situations, certainly, Your Honor, as was the case in the Shumway decision. However, the current decision is very different because this particular area was found to be, as noted in the 03 … Near the freeway, but I was near a freeway many hours away from any human settlement in Nevada. I didn't think that that near the freeway did anything. Well, this is, in fact, even closer than that. It's within 30 minutes of Alpine, which is a fairly large community. Therefore, should plaintiffs wish to conduct large-scale mining activities, they could have the equipment stored in Alpine and brought to the site each day, thereby minimizing the service disturbance and protecting the forest. I think that goes to the plan of operations, I think, more than the property right, doesn't it? It's related sort of both ways, Your Honor. The idea that we're not taking anything away from you by removing the structures because you can still bring equipment on to the land if you wish. At the time that the Forest Service discovered that at least one of the structures was being used for what looked like the activities of ordinary life, having breakfast and such, did it find evidence that the structures were also used as assisting in sluicing for quartz or however they get quartz? I don't know much about quartz mining. Nothing in the record, Your Honor, and certainly nothing to show any sort of large-scale activities. It was all very much small-scale recreational at best. What do they use quartz for? Quartz is considered one of the valuable minerals. However, it's much lower down the scale. Is it more like when you mine for gravel and they use it for roads or when you mine for marble and you use it for decorative stone or mine for gold and it's valuable even a little mayonnaise jar? It's certainly not as valuable as gold, Your Honor. In fact, as it's been described to be by mineral experts, in order to make a quartz mining operation financially successful, it requires a very large finding of quartz. You have to have enough volume to make it worth your while. You don't know what they use it for? Not precisely, Your Honor. I suspect it is far more similar to, as you described, the marble, decorations, things like that, rather than for being precious metal in and of itself, such as gold. I see you're running out of time. Anything else? Okay. Thank you, Mr. Chu. Thank you, Your Honor. Ms. Merch, back to you. Thank you, Your Honor. It's my understanding, by the way, that quartz is used now in making computer chips or something to do with computers. I don't know if that's right or not, but that's what Mr. Swanson told me at one time. I'd like to get to Your Honor's question about whether this collateral estoppel applies on the issue of the use. And I'm looking at the issue of the use. And I'm thinking not of collateral estoppel, not of issue preclusion. But claim preclusion, which we typically call res judicata. Why couldn't you have raised this claim in 2006 that we had an informal right to use this property and, therefore, you can't knock it down? Well, I think where I'm getting caught up here is on the second suit, it's after it had been demolished and then it had been taken there. And that's when the claims ripened. Right. But you didn't seem to make any claim in that suit. But you could have, that the Forest Service told us we could use this property and their permission, whatever the nature of their permission was. I haven't focused on the nature of their permission. Whatever the nature of their permission was gave us the right to continue to use this property and, therefore, they've done something bad. They're proposing to do something bad and knocking it down. That claim was available to you in 2006 because the permission was supposedly given in what, 1977? Yes. And if you didn't make it, didn't you lose it? I thought that I did make it in the first instance. Okay. And if you did make it and the judge dismissed your complaint with prejudice, then why does it survive? Well, I'm looking at page 135 of the appendix, and it's where the ‑‑ and this actually has to do with collateral estoppel. But it just says that when it was finding it as moot, that's not a final. Let's see. The last sentence, it's not final. No, that's what Judge Gonzales says. Judge Gonzales says there's no issue preclusion because the judge found it to be moot. But it's a claim you had to bring at that time, I think, or lose in 2006. You can't split your claims and save one for later. And the complaint gets dismissed with prejudice. Don't you have to appeal and tell the Ninth Circuit that, gee, the judge made a mistake in dismissing my complaint with prejudice? Well, I agree with that. But I still believe in the first suit that it was deemed moot. So it wasn't ‑‑ it was brought up in the first case is what I'm trying to say. It was brought up, but it was deemed moot. Okay. I think I understand your position. Okay. Thank you very much, Ms. Moore. Thank you. Mr. Chu, thank you as well. The case has started. You can submit it.
judges: Kleinfeld, Silverman, Hurwitz